APPLERA CORPORATION and Roche Molecular Systems, Inc., plaintiffs,

v.

MJ RESEARCH INC. and Michael and John Finney, defendants.

No. 3:98 CV 1201 JBA.

United States District Court, D. Connecticut.

Dec. 22, 2004.

Brian M. Poissant, Bruce J. Barker, Pennie & Edmonds, Charles W. Bradley, Jennifer Gordon, Joseph Evall, Robert A. Cote, Stephen J. Lieb, John Josef Molenda, Patrick J. Hoeffner, Sharon Yang, Orrick, Herrington & Sutcliffe, Lawrence B. Goodwin, Chadbourne & Parke, Wendy Schechter, Heller Ehrman White & McAuliffe LLP, William J. Hone, Fish & Richardson, PC, David J. Lender, Gianluca Morello, David Greenbaum, Rita Lynn Berardino, Weil, Gotshal & Manges, New York, NY, David Gersch, Asim Varma, Bertrand R. Lanciault, III, Jean C. Kalicki, Michael J. Klyce, Jr., Arnold & Porter, Mary L. Azcuenaga, Heller Ehrman White & McAuliffe LLP, Washington, DC, James T. Shearin, Aimee Jennifer Wood, Pullman & Comley, Bridgeport, CT, Gwen P. Weisberg, James Sicilian, Mario R. Borelli, Robin L. Smith, Day, Berry & Howard, Hartford, CT, Jennifer K. Lawson, Testa, Hurwitz & Thibeault, Boston, MA, Edward R. Reines, Matthew D. Powers, Paul Ehrlich, Weil, Gotshal & Manges, Redwood Shores, CA, for Plaintiffs.

A. Jason Mirabito, Brett N. Dorny, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., William A. Marino, Geri L. Haight, Ivor R. Elrifi, John A. Harre, Joseph G. Blute, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Joseph B. Darby, III, Greenberg & Traurig, Boston, MA, Albert L. Jacobs, Jr., Joseph M. Manak, Gerard F. Diebner, Greenberg Traurig, Christine Cora True–Frost, Latisha Thompson, Radu A. Lelutiu, Rudolf Koch, John E. Beerbower, Cravath, Swaine & Moore, Daniel A. Ladow, Graham & James, David A. Hoffman, Cravath, Swaine & Moore, Mary Morabito Rosewater, Schulte, Roth & Zabel, New York, NY, C. Allen Foster, Kevin E. Stern, Timothy C. Bass, David S. Panzer, Greenberg Traurig, LLP-DC, William C. Brashares, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, Washington, DC, Donna Nelson Heller, Finn Dixon & Herling, Harold Bolton Finn, III, Meghan A. Laganza, Patrick J. McHugh, Finn Dixon & Herling, Stamford, CT, for Defendants.

## Ruling on Motion of MJ Research, Inc. for Summary Judgment Determining that Plaintiffs' Licensing Scheme Imposes a Total Sales Royalty [Doc. # 1123] and Plaintiffs' Cross Motion for Summary Judgment Seeking a Determination that Applera's Licensing Program does not Impose an Improper Total Sales Royalty and Thus is Not Patent Misuse [Doc. # 1153]

ARTERTON, District Judge.

Defendant/counterclaim plaintiff MJ Research, Inc. ["MJ"] and plaintiffs/counterclaim defendants Applera Corp.[1] and Roche Molecular Systems, Inc. have filed cross motions for summary judgment on defendant's patent misuse defense that Applera's licensing program improperly requires suppliers to pay royalties on all thermal cycler sales, when some portion of those thermal cyclers are not used in a

---

1. On June 28, 2002, Applera Corporation and Perkin–Elmer ("PE") Corporation, its wholly owned subsidiary, entered into an agreement and liquidation plan in which PE Corporation was liquidated and the entirety of its assets, including intellectual property rights, was transferred to Applera Corporation. On June 3, 2003, this Court granted plaintiff's motion to amend the caption in this lawsuit to reflect the official change in Plaintiff's identity from "PE Corporation" to "Applera Corporation." See [Docs. # 664, 674]. For consistency, this Court will refer to plaintiff as Applera, even when referring to pre–2002 events.

manner which infringes Applera's patent. While this issue previously had been raised in a summary judgment motion, it was not addressed in the Court's (Squatrito, J., presiding) ruling. *See* [Doc. # 624]. After plaintiffs sought to exclude evidence on the total sales royalty issue through a motion in limine, the Court gave the parties leave first to supplement their briefing and record on this issue and later to renew their summary judgment motions. For the reasons discussed below, Applera's motion is granted, and MJ's motion is denied.

## I. Background

Applera has patented the performance of PCR on a thermal cycler,[2] and licenses the right to perform PCR on a thermal cycler in its fields in two ways. First, an end user performing PCR on a thermal cycler pays a royalty when purchasing "reagents," or enzymes used in the PCR process, from Applera or from a licensee of Applera. Second, a licensing fee is paid for each thermal cycler, after which the thermal cycler is referred to as "authorized" for use in performing PCR without infringing Applera's PCR process patents. Applera has both end user and supplier authorization programs for licensing "authorized" thermal cyclers. That is, an end user either may buy a thermal cycler that has already been authorized for use in PCR, because the supplier purchased a license through Applera's Supplier Authorization Program ("SAP"), or an end user may purchase an unlicensed thermal cycler and obtain the right to use the thermal cycler to perform PCR through Applera's End User Authorization Program

("EAP"). Applera has aggressively sought suppliers' participation in the SAP, telling suppliers who refuse to participate that they are at risk of liability for inducing infringement of Applera's PCR Process Patent. The SAP, therefore, serves two independent purposes: (1) it serves as a means of administering the licensing of end users to perform PCR on thermal cyclers, and (2) it allows suppliers to promote their thermal cyclers for PCR without risking inducement liability.

MJ, a manufacturer and supplier of thermal cyclers, has declined to participate in the SAP on the terms Applera has offered, and argues that the SAP is a form of patent misuse, because the SAP coerces suppliers to agree to pay a royalty on the total sales of all thermal cyclers sold, regardless of whether the thermal cyclers are in fact used for PCR.

Applera introduced its Supplier Authorization Program in 1994, informing several thermal cycler suppliers, including MJ, of their activities related to promotion for PCR use that Applera regarded as inducing infringement of its PCR process patents, and announcing that "Perkin–Elmer has adopted a licensing program that enables thermal cycler suppliers to promote their instruments as 'authorized for PCR'." Letter from Hanna Fischer to John Finney, May 18, 1994 [Doc. # 1124, Ex. 1]. Following this announcement, the parties entered into negotiations over the terms of the licensing proposal. In January 1995, for example, MJ wrote to Applera asking for clarification about how the authorization program operated in practice.[3] *See*

2. Applera's '188 patent (U.S. Patent No. 4,965,188) covers "the performance of PCR using a thermostable enzyme, in which the heating and cooling steps required by PCR ... are automated by a machine that controls temperature levels, transitions from one temperature to another, and the timing of the

temperature levels." Joint Stipulation Regarding Claim Construction of the '202, '195, and '188 Patents [Doc. # 640] at ¶ 4. In other words, the patent covers the performance of PCR on a thermal cycler.

3. MJ asked in its letter the following questions:

Letter of Michael Finney to Hanna Fischer, January 31, 1995 [Doc. # 1124, Ex. 3]. In February 1995, Applera responded, stating that in its view, its licensing plan was offered for "convenience" "using as a royalty base all thermal cyclers capable of performing PCR," and suggesting "as a royalty an amount that reflects that a minor percentage of thermal cyclers are not used for PCR' for research (or another 'Field')." Letter of Hanna Fisher to Michael J. Finney, Feb. 23, 1995 [Doc. # 1124, Ex. 4] at 2–3. Applera responded to MJ's particular concerns by stating:

> If the user transfers an Authorized Thermal Cycler to another lab or another user, the up-front process rights go with the thermal cycler.... Certainly, for example, when an MJ thermal cycler quickly fails and is replaced free, we would waive a second authorization fee unless and until the first instrument were repaired and resold. If the situations you describe are not rare, I suggest, again for simplicity and convenience, taking them into account in the royalty rate based on figures you provide. However, if you insist, we can negotiate provisions for various situations based on your actual experience. I think other approaches to granting your company the right to convey up-front rights of a PCR license are less simple and more costly; but we are willing to consider any proposal."

*Id.*

In its reply, MJ expressed concern about the inability under the SAP for an end user to transfer the PCR process license between thermal cycler machines, and indicated that it was not inclined to accept a per-cycler license fee. *See* Letter from Michael Finney to Michael Hunkapillar, Feb. 28, 1995 [Doc. # 1189, Ex. 2] at PE 011906–07. MJ instead continued to focus on the possibility of distributing end user licenses to its customers, or on simply informing its customers of the need to obtain end user licenses from Applera, instead of itself participating in a supplier licensing program of any sort. *See* Letter from Michael Finney to Hanna Fischer, Mar. 15, 1995 [Doc. # 1124, Ex. 5] at PE 011902A ("We intend to provide to any customer who contacts us, a notice explaining that Authorizations are available from Perkin Elmer. We would also like to provide at the time of sale, a copy of your most recent Thermal Cycler Authorization Agreement. This should aid our customers in obtaining Authorizations."). Appl-

---

"If a user's authorized thermal cycler fails under warranty and is replaced, free of charge, with a new machine, must a second license fee be paid for the new machine? If the notice or serial number of a user's authorized thermal cycler is destroyed in an accident, can it be replaced? If a user's authorized thermal cycler is destroyed in an accident and replaced, must a new license be paid? If an authorized thermal cycler is stolen and replaced, must a new license fee be paid? If the stolen cycler is seized by the police and sold at an auction, along with the notice, is the license valid for the new owner? The proposed agreement states that transfer of a thermal cycler without serial number or notice terminates the license. But can a user sell the license without the thermal cycler?

If a user owns both an authorized thermal cycler and an unauthorized thermal cycler, can the user transfer the license between them? If a user owns an unauthorized thermal cycler that is never used for PCR, must that user pay a license fee? If a user owns an unauthorized thermal cycler that is used for PCR only in a field not licensed to Perkin–Elmer, must that user pay a license fee? Can a thermal cycler supplier sell a thermal cycler to a user who does not plan to do any PCR with it, or who plans to do PCR only outside of Perkin Elmer's licensed fields, without either user or supplier having to pay a license fee?" *See* Letter of Michael Finney to Hanna Fischer, Jan. 31, 1995 [Doc. # 1124, Ex. 3].

era rejected this offer, stating that it raised "serious legal issues," in that the "act of distribution [might itself] be promoting [MJ's] instruments for PCR use," and MJ could incur liability if the customers did not execute the agreement. Applera suggested that they "lay [MJ's] offer aside, at least for now, as an unneeded complication." Letter from Hanna Fischer to Michael Finney, Mar. 22, 1995 [Doc. # 1124, Ex. 6].

While Applera's and MJ's initial negotiations did not produce agreements, Applera subsequently entered into SAP licensing agreements with several thermal cycler suppliers, at which point its negotiating position with MJ and other nonparticipating suppliers hardened. In a letter to John and Michael Finney on August 1, 1995, Applera's licensing director stated, "At present, my ability to vary the offered terms is limited ... because of our desire to treat the licensees equally. Your proposal ... is unacceptable for that reason, among others." Letter of Hanna Fischer to John and Michael Finney, Aug. 1, 1995 [Doc. # 1124, Ex. 8]. Applera also informed MJ at this time that Applera did not believe that MJ was immunized from inducement liability by its distribution of notices which informed its customers of their need to obtain end user licensing rights from Applera. *See id.* ("notwithstanding ... the distribution of such notices, MJ Research's sales of its thermal cyclers to facilitate [any practice of the PCR process] constitutes inducing infringement in any instance where the customer fails to pay the full royalty—especially in view of MJ Research's full awareness that its thermal cyclers are intended for use in practicing the PCR process.").

MJ rejected the licensing arrangement Applera proposed, and continued to negotiate for a program more closely linked to the actual PCR use by end users. In response to MJ's counter-offers, Applera reiterated its position on the advantages of a licensing scheme based on the total number of thermal cyclers sold, discounted to reflect a percentage of thermal cycler buyers who do not use the machines for PCR.[4] Applera alternatively offered MJ a licensing program in which a royalty would be paid only on those thermal cyclers actually used for PCR. *See* Letter of Hanna Fischer to Michael J. Finney, Oct. 4, 1996 [Doc. # 1124, Ex. 9]. Under the terms of this proposal, Applera required that MJ take steps to ensure that its customers were not using the "unauthorized" thermal cyclers for PCR,[5] disable the software in the

---

**4.** "By averaging across all thermal cyclers, all of which carry the up-front PCR license rights, Perkin–Elmer's licensing and administrative costs are greatly reduced. We pass that savings along. The manufacturer's rate offered ($400.00 per 96–sample capacity thermal cycler used for PCR) permits manufacturers to recover their payments to Perkin–Elmer and their other costs at a fee price to PCR users equal to Perkin–Elmer's direct fee price to PCR users ($1000.00 per 96–sample capacity thermal cycler used for PCR). Manufacturers are solely responsible for their own pricing and distribution systems and are totally free to charge different prices to PCR users and users who will not perform PCR. A further advantage is that manufacturers can legally promote and support their instruments for PCR and advertise them as 'Authorized for PCR', because they are." Letter of Hanna Fischer to Michael J. Finney, Oct. 4, 1996 [Doc. # 1124, Ex. 9].

**5.** "[For each thermal cycler that is not authorized for PCR], MJ Research will obtain from the customer, in advance of purchase and annually until 2004 a written statement that the thermal cycler (a) will not be and, after purchase has not been, used for PCR, or (b) will be used for PCR but not in Research or another Perkin–Elmer Field, or (c) will be used in a country where no PCR process claims are issued or pending, as the case may be. Perkin–Elmer will initially provide MJ Research with the statement form to be used.

thermal cycler providing for automated performance of PCR; include software designating before each use whether the thermal cycler was authorized or not authorized for PCR use; provide Applera with a quarterly report of all thermal cyclers sold without PCR rights (including customer name and address, instrument model and serial numbers); pay an issuance fee of $30,000; and pay a thermal cycler authorization fee of $900.00 for each "authorized" thermal cycler sold with a sample capacity of up to 96 samples. *See id.* at ¶¶ 3–8.

MJ rejected Applera's alternative, on the grounds that the responsibility for obtaining licenses rested solely with the end user performing PCR on the thermal cycler, and that as a supplier, it did not want to be involved in enforcing or policing Applera's licensing requirements.[6] *See* Letter from Michael Finney to Hanna

Fischer, Dec. 12, 1996 [Doc. # 1124, Ex. 10]. It countered by restating a proposal from May 1995, in which MJ would be "given the right to print 'authorization' stickers, sell thermal cyclers with such stickers, and periodically forward revenues to Perkin–Elmer." *Id.* As a "temporary measure", MJ also proposed "purchas[ing] blocks of 'authorization' stickers with the model and serial numbers left blank, fill in the information as the need arises, and forward the information to Perkin–Elmer." *Id.*

Several months later, as negotiations between MJ and Applera remained stalled, MJ attempted to purchase end user licenses for several of its customers, but was rebuffed by Applera, which stated that its end user program was not meant for manufacturers.[7] Applera expressed its dissatisfaction with MJ for declining Applera's

---

MJ Research will provide Perkin–Elmer with a copy of all statements. . . ." Letter of Hanna Fischer to Michael J. Finney, Oct. 4, 1996 [Doc. # 671, Ex. 5].

6. "The decision to purchase an "authorization" license is solely at the discretion of the thermal cycler user. Since there are many possible uses of thermal cyclers, including cycle sequencing and applications of PCR for which Perkin–Elmer has no rights, it is not the place of a thermal cycler manufacturer or vendor to enforce the purchase of any type of license. As a service to those of our customers who wish to purchase an authorization license, we wish to make available pre-licensed thermal cyclers. Certainly the onerous enforcement requirements of the offer you have sent us are not worth a 10% discount on the price already available to us for the licenses [as Applera sold end user licenses for $1000 per cycler]." Letter from Michael Finney to Hanna Fischer, Dec. 12, 1996 [Doc. # 1124, Ex. 10].

7. *See* Letter from Hanna Fischer to Michael Finney, Aug. 15, 1997 [Doc. # 1124, Ex. 12] at PE 011750 ("I am returning with this letter your company's check for $23,450 which I understand was intended to be for the upfront PCR license fee you wish to include with

23 thermal cyclers being sold to PCR Users. As recently reiterated in my July letters, 'PCR User' agreements are not for manufacturers, and we will not accept them from MJ Research."); *see also* Letter from Hanna Fischer to Michael Finney, Jul. 2, 1997 [Doc. # 1124, Ex. 11] at PE 011767 ("Very recently your company sent in a few PCR End User TC Authorization Agreements, which your company executed as the 'PCR User'. We were somewhat apprehensive that MJ Research might be obtaining these agreements on behalf of others outside your company, effectively acting as our agent which we had already rejected. We, therefore, emphasized to your employees that these are PCR User agreements, not agreements for instrument manufacturers . . . It is now quite clear that you are doing the very thing Perkin–Elmer refused to allow you to do. Your recent advertisement, 'The MJ Research Notebook' for Summer 1997, states to the scientific community that your company is Perkin–Elmer's agent for the purpose of issuing stickers that a PCR User obtains when she receives an Authorization Agreement. This is untrue! Perkin–Elmer demands that the ad be recalled and that such misrepresentation cease immediately.")

October 1996 offer "without a counteroffer," and made clear that it did not consider MJ's offer to purchase end user licenses to be a serious alternative. Applera continued, "You cannot seriously contend that your invitation for yet a different offer was a counter offer that put the negotiating ball in my court.... Perkin–Elmer has never agreed to revise our October 1996 proposal; it is not doing so; it has no intention of doing so; and is under no business obligation to do so. We have given you two bases on which to negotiate. Despite your rejection of both, we remain willing to proceed with either." *See* Letter from Hanna Fischer to Michael Finney, Aug. 15, 1997 [Doc. # 1124, Ex. 12] at PE 011750–011751. MJ, in turn, restated the reasons for its opposition to Applera's licensing proposals:

> [W]e have a very substantial number of customers who neither need nor wish to pay for authorizations ... Perkin–Elmer has, at our request, provided us with a proposal allowing us to sell authorizations to some but not all of our customers. I will not get into detail on this document, except to say that it was based on the premise that thermal cycler users who do not perform PCR in [Applera's] fields would be extremely rare. The proposal therefore imposed unacceptable burdens on us to police those users.

Letter from Michael Finney to Michael W. Hunkapiller, Sept. 30, 1997 [Doc. # 1124, Ex. 13].

In response, Applera again proposed a licensing program with royalties paid only for those thermal cyclers actually used for PCR, but refused to modify the enforcement burden the program would place on MJ. This new proposal did, however, significantly lower the royalty fee paid for each "authorized" thermal cycler, to $430 per 96 sample capacity cycler, and removed the requirement that the software for performance of PCR be disabled.[8] *See* Letter of Hanna Fischer to Michael J. Finney, Jan. 15, 1998 [Doc. # 1124, Ex. 14]. After MJ again refused this plan on the ground that it did not want to "police" its own customers, Applera returned to its original offer of using an "averaging" approach, in which "the authorization fee paid to Perkin–Elmer is based on the ratio of the number of MJ Instruments needing an authorization relative to the total number of MJ instruments sold (i.e. the number needing authorization plus the number of thermal cyclers not needing an authorization). Thus, the authorization fee base would include all thermal cyclers, but the total amount paid by MJ would be reduced by an amount proportional to the number of instruments not requiring an authorization." Letter of Joseph H. Smith to Michael J. Finney, Jan. 30, 1998 [Doc. # 1124, Ex. 15] at PE 011718. Applera stated:

> We do not seek to influence whether you charge an authorization fee, to whom you charge an authorization fee, or how much you charge for an authorization fee. You could, for example, charge $500 to those who need it and $5 to those customers who might need it only for resale of their instrument. Or you could charge any other amount.... Under the averaging method, it is agree-

---

8. While MJ asserts that the January 1998 proposal differed from the October 1996 offer in that it immunized MJ from suit, as the Court reads the two proposals offered to MJ, both the 1996 and the 1998 versions provided that "MJ Research may promote its thermal cyclers for PCR and advertise its thermal cy-

clers as "Authorized for PCR", which will not be considered to be "inducement of infringement if the remaining terms are complied with." *See* Fischer Letter, Oct. 4, 1996 [Doc. # 1124, Ex. 9] at PE 011791; Fischer Letter, Jan. 15, 1998 [Doc. # 1124, Ex. 14] at PE 011687.

able to us if you wish to simplify your distribution by including an authorization notice for every thermal cycler. That would benefit all customers because then every thermal cycler could be resold as already authorized. Also, as I told you it is perfectly acceptable to us if you include authorization notices only for customers who need them. Whichever of these alternatives you use is strictly up to you."

Letter of Joseph H. Smith to Michael J. Finney, Jan. 30, 1998 [Doc. # 1124, Ex. 15] at PE 011718–011719.

Although Applera had long insisted that its studies estimated that 7% of thermal cycler users did not perform PCR on the machines, in its last offer, made one month after this suit was filed, Applera proposed "an alternative approach in which we would adjust the average price paid per unit sold to account for the actual level of sales of MJ thermal cyclers used exclusively for non-PCR applications. This level would be determined through an independent market survey of a statistically significant random sampling of MJ thermal cyclers placed in customers' labs over the last three years. . . ." Letter of William B. Sawch to John D. Finney, Michael J. Finney, Jul. 20, 1998 [Doc. # 1124, Ex. 16] at MJ 6505739–6505740.

MJ accepted none of the proposals, counter sued for antitrust violations, and asserted a patent misuse defense based in part on plaintiffs' per-thermal cycler royalty fee requirement under the SAP.

## II. Standard

Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and

is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

On cross-motions for summary judgment "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it. When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993) (*citing Schwabenbauer v. Board of Educ. of Olean,* 667 F.2d 305, 313 (2d Cir.1981)). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Schwabenbauer,* 667 F.2d at 314.

## III. Discussion

 A patent provides its owner with the "exclusive right to manufacture, use and sell his invention." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 135, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). A patent holder therefore has a legal monopoly and significant freedom to license or refuse to license the use of the patented invention, including "to exact royalties as high as he can negotiate with the leverage of that monopoly." *Brulotte v. Thys Co.,* 379 U.S. 29, 33, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964). In exercising this leverage, a patent holder may not, however, exceed the scope of the patent, and it is therefore well established that "conditioning the grant of a patent license upon payment of royalties on products which do not use the teaching of the patent [ ] amount[s] to patent misuse." *Zenith Radio,* 395 U.S. at 135, 89 S.Ct. 1562. The

Supreme Court has defined "conditioning" to mean "where the patentee refuses to license on any other basis and leaves the licensee with the choice between a license so providing and no license at all." *Id.*

Applying this rule, the Supreme Court in *Zenith Radio* affirmed the trial court's injunction against Hazeltine Research's standard licensing agreement, which Hazeltine had insisted Zenith Radio accept. The licensing agreement covered approximately 500 patents related to the radio and television fields, and required radio or television manufacturers to pay royalties for this package based upon the licensee's total radio and television sales, "irrespective of whether the licensed patents were actually used in the products manufactured." *Id.* at 134, 89 S.Ct. 1562. This licensing arrangement was deemed patent misuse. Significantly, however, not all total sales royalty agreements were struck down, in recognition that such agreements frequently serve the parties' "mutual convenience." The Supreme Court prohibited only those resulting from "conditioning." *Id.* at 135, 89 S.Ct. 1562; *see also Glen*

*Mfg. Inc. v. Perfect Fit Indus., Inc.,* 420 F.2d 319, 320 (2d Cir.1970).

Thus, in assessing whether Applera's licensing program constituted patent misuse, it is necessary to first address whether the Supplier Authorization Program in fact includes a total sales royalty provision, and second, whether Applera could be found to have "conditioned" the grant of its patent license based on acceptance of the total sales royalty so as to be patent misuse and potentially an antitrust violation.

## A. Total Sales Royalty

MJ argues that Applera's licensing program exceeds the scope of its patents by imposing royalties based on the total sales of all thermal cyclers sold, even though some thermal cyclers are never used to perform PCR.[9] The parties dispute the percentage of thermal cyclers used exclusively for purposes other than PCR in the fields covered by Applera's patents,[10] but acknowledged at oral argu-

---

9. Further, MJ asserts that the SAP requires royalties on unpatented equipment, pointing to seven SAP agreements that require payment of royalties on "all modules and components." MJ argues that such components include spare parts used merely in lieu of the existing blocks for which a royalty had already been paid, and therefore the royalty fee would be unnecessary to protect Applera's patent rights.

10. *See, e.g.* Trial Transcript of Dr. Gerald Ford [Doc. # 1108] at 2198–2199 (testifying that study showed that 95.75% of all MJ Research thermal cyclers in the United States have been used to perform PCR in a Perkin–Elmer [Applera] field). MJ challenges this survey on grounds that the survey asked to speak with the person most knowledgeable about how thermal cyclers in the lab were used, which would not necessarily limit the respondents to persons with first-hand knowledge of the facts of interest; and that the survey did not adequately ascertain whether

the respondents were familiar with the technical distinctions among the "fields" of use (which comprised the study because Applera's patent rights extended only to certain fields). See id. at 2229–33, 2234–39. *See also* Letter from Joseph Smith, PE to Michael Finney, MJ, Jan. 30, 1998 [Doc. # 1124, Ex. 15] at 1 (stating that "worldwide, at least 93% of thermal cyclers need authorization" and offering to discount the royalty to reflect the 7% of thermal cyclers not used for PCR). MJ states that this percentage is misleading, because it was calculated on the usage pattern of PE/Applera's thermal cyclers, which were all "authorized," so end users had no incentive to segregate out some thermal cyclers for non-PCR use. *See* Deposition of Murray S. Anderson, Jun. 20, 2000 [Doc. # 922, Ex. 45] at 186. In addition, MJ states that PE/Applera did not discount based on use outside of its fields, or outside of the United States. *See id.* at 180.

MJ's evidence suggests a higher percentage of thermal cyclers are used for non-PCR pur-

ment that this factual dispute is not material to a determination of patent misuse or antitrust liability. Addressing Applera's "averaging method," which discounts the royalty price to reflect a percentage of thermal cyclers not used for PCR, MJ maintains that it still must be deemed a total sales royalty, because averaging is a fiction when Applera can manipulate the base royalty fee before it is discounted to achieve any desired result, and because the rate is never adjusted to reflect actual use of Applera's patents.[11]

Because there is never a retroactive adjustment reflecting actual use, the averaging approach used by Applera in its Supplier Authorization Program can be deemed a total sales royalty, and would constitute patent misuse if Applera improperly conditioned the license on the payment of royalties on unpatented products, which MJ urges is the non-PCR use of thermal cyclers to which it is undisputed Applera had no patent rights. As *Zenith Radio* instructs, "misuse inheres in a pat-

entee's insistence on a percentage-of-sales royalty, regardless of use, and his rejections of licensee proposals to pay for actual use." 395 U.S. at 139, 89 S.Ct. 1562.

**B. Conditioning**

■ MJ disputes both the existence and viability of the alternative licensing program offered by Applera. Although MJ acknowledges that Applera offered an alternative beginning in October 1996, MJ challenges the existence of the alternative on four grounds: (1) Applera did not offer an alternative to the SAP prior to October 1996; (2) the alternative was never formalized in contract form; (3) Applera did not offer an alternative to other thermal cycler manufacturers; and (4) the alternative was meant only as a litigation record. Each of these arguments lacks merit. There is no basis for finding patent misuse during the two year period prior to Applera's first offer of an alternative licensing program in October 1996, because the record reflects

---

poses. *See, e.g.* Videotaped Deposition of Michael Finney, Oct. 7, 1998 [Doc. # 559, Ex. 2] at 176 ("I would guess of the thermal cyclers that we are currently selling at this point, perhaps 20 percent are never used to perform PCR"); Declaration of Michelle Lizotte–Waniewski, Feb. 13, 2004, ¶¶ 7, 9 (stating that Human Genome Project was completed using cycle sequencing, not PCR, and estimating that PCR has accounted for 40–50% of all reactions on thermal cyclers over the last ten years); Affidavit of Richard K. Wilson, Mar. 5, 2001, ¶¶ 15–17 (stating that *90% of thermal cyclers in his genome se-quencing lab* are devoted to the performance of cycle sequencing). Applera argues, however, that MJ's evidence from sequencing labs, where cycle sequencing is concentrated, does not dispute that most thermal cyclers are used at least once for PCR. *See* Plaintiff's Submission in Response to Defendant's Supplemental Brief in Opposition to Plaintiff's Motions in Limine [Doc. # 937] at 6 n. 10.

**11.** Moreover, MJ asserts that even if the discount to the supplier matches the number of

thermal cyclers used for PCR, purchasers of thermal cyclers would still pay a fee for the PCR process rights regardless of whether they need them. However, Applera expressly stated to MJ that Applera played no role in suppliers' decisions about what to charge its customers and the SAP does not require the suppliers to impose its royalty fee on all thermal cycler buyers. Thus, MJ, like all suppliers, would be, at least in theory, free to determine which of its customers need the patent license, and which do not, and charge them accordingly. *See, e.g.* Letter of Joseph H. Smith to Michael J. Finney, Jan. 30, 1998 [Doc. # 671, Ex. 2] at 1–2. MJ rejoins that the supplier "would still be compelled by market dynamics to collect a fee from every customer." *See* Supplemental Brief in Opposition to Plaintiffs' Motions in Limine [Doc. # 924] at 26; *see also* Almarin Phillips Affirmation, Feb 13, 2004 [Doc. # 914], at ¶¶ 3–9 (stating that differential pricing is not possible in the thermal cycler market in the case where the manufacturer is paying a royalty on each instrument regardless of where it is licensed).

no more than an ongoing negotiation process during this period. MJ expressed confusion about how the SAP operated; Applera explained why it believed the SAP was more convenient than other licensing options and attempted to address some of MJ's concerns; MJ made clear that it did not believe a supplier licensing program of any kind was appropriate but that it would assist Applera in distributing end user licenses; Applera rejected MJ's offer to distribute end user license contracts because MJ would remain unlicensed and therefore could still induce infringement, without enforcement measures to ensure that all end users performing PCR obtained licenses. Applera never presented its SAP as a non-negotiable offer, and, in fact, invited MJ to submit a proposal that would address concerns about licensing thermal cyclers not used to perform PCR. *See* Letter from Hanna Fischer to Michael J. Finney, Feb. 23, 1995 [Doc. # 1124, Ex. 4]. MJ, for its part, never expressly rejected the SAP formula, and never submitted a counterproposal for an alternative *supplier* licensing plan based on actual use.[12] In light of the fluid nature of the negotiations between Applera and MJ, there is no evidence from which it can be inferred that Applera's two year delay in offering an "actual use" supplier licensing program constituted patent misuse. *See Zenith Radio*, 395 U.S. at 139, 89 S.Ct. 1562 ("patent misuse inheres in a patentee's insistence of a percentage-of-sales royalty, regardless of use, and his rejection of licensee proposals to pay only for actual use"); *Bayer AG v. Housey Pharmaceuticals, Inc.*, 228 F.Supp.2d 467, 471 (D.Del.2002) (finding no patent misuse where no alternative to total sales royalty was offered because the prospective licensee "provided no evidence of proposing a licensing arrangement to pay for actual use" and simply blamed the patent holder for not offering an alternative).

MJ's argument that there was in fact no alternative licensing proposal because Applera did not formalize its proposal in contract form is similarly unpersuasive. *Zenith Radio* imposes no such requirement, particularly where, as here, MJ never expressed interest in pursuing Applera's alternative proposal.

MJ also points to evidence that Applera's licensing program using the total sales royalty became "entrenched" after it reached agreements with some other thermal cycler manufacturers, and that Applera did not offer an alternative to the total sales royalty to other manufacturers. *See, e.g.* Letter from Hanna Fischer to Geoff Rampton, Protean PLC, Nov. 25, 1995 [Doc. # 470, Ex. 50].[13] As MJ points out, all of the SAP agreements signed by thermal cycler suppliers include essentially identical royalty provisions, even though some suppliers objected to the total sales royalty. *See* Beerbower Affirmation [Doc. # 923, Exs. 49–64].[14] Applera's licensing

---

12. MJ's offer to distribute *end user* licenses was not such an alternative, because under such an arrangement MJ would not be the licensee at all. A supplier license would allow suppliers to promote their thermal cyclers for PCR use without risking liability for inducing infringement of Applera's process patents.

13. Applera's November 25, 1995 letter to Protean states that it "has already licensed three thermal cycler suppliers and, therefore, the financial terms of the Thermal Cycler Supplier Agreement are already set and no longer negotiable." *Id.*

14. In addition, suppliers who ultimately did not participate in the SAP expressed concerns to Applera. *See, e.g.* Letter of Hubert Wagner, Barnstead/Thermolyne, to Hanna Fischer, Oct. 19, 1995 [Doc. # 922, Ex. 43] ("The terms which B/T thinks are onerous and would like amended are as follows: ... [T]he purchasers of B/T's units should have the option of purchasing either a unit which has been licensed for the PCR process or one that

arrangements with other suppliers, however, cannot provide a defense to MJ's infringement when MJ was undisputedly offered a licensing alternative to the total sales royalty. The evidence submitted, moreover, cannot establish that Applera rejected all alternative licensing arrangements based on the actual use of the process patents. MJ's most compelling evidence is from Simon Constantine, Board Director of Life Sciences International, the parent company of Hybaid, a thermal cycler supplier. In notes Constantine took of a meeting with Applera, he indicates that Hybaid offered, and Applera rejected, Hybaid's proposed alternative to a total sales royalty.[15] In an accompanying affidavit, Constantine states that "[o]n several occasions, I extended compromise offers on Hybaid's behalf, which were met by Dr. Fischer [of Applera] with uncompromising rejection." Affidavit of Simon J. Constantine, Jan. 15, 2001 [Doc. # 427] at ¶ 7. Constantine does not state, however, that Applera rejected any licensing plan based on the actual use of the patent. Other evidence MJ cites reveals not "conditioning" on acceptance of the total sales royalty, but rather negotiations over the *rate* of

---

does not provide the user such a license. The units sold without a license would be clearly marked as 'Not Licensed for use in performing the PCR process.' B/T would not of course have to pay Perkin–Elmer for units sold without a license."). The Court can find nothing in the record indicating Applera's response to this letter, or showing that Applera refused to consider actual use proposals or to license B/T if B/T did not accept the terms of Applera's initial SAP proposal.

MJ also notes that other suppliers protested the SAP because the thermal cyclers they sold had multiple uses not simply PCR. *See* Letter from Richard Coy, Coy Corp. to Hanna Fischer, July 7, 1994 [Doc. # 1124, Ex. 28] (stating that Coy's "instruments have multiple uses, not just for the PCR process," and that in its view its manufacture and sale of these products did not constitute inducement of infringement."); Letter from Kirk Ririe, Idaho Technology, Sept. 9, 1994 [Doc. # 1124, Ex. 29] (stating that its thermal cyclers were not suitable for PCR and that it did not believe it was infringing Applera's process patents). Neither Coy nor Idaho technology specifically object to the total sales royalty aspect of the licensing program, however, instead challenging their need for a license of any kind. Moreover, there is no record evidence of Applera's response to these letters or of any further negotiations between Applera and these suppliers.

15. In these notes, Constantine writes: "SJC explained that he wanted to set out the basis behind our offer of 6.6.96... $300 a command module accepted, will be added to our invoices with the customer allowed not to pay it if either they do not use it for PCR or they are licensed in some other way...HF responded—$300 is a weighted average and takes account of the fact that some sites are authorized already in some disciplines. It is a charge on the manufacturer, rather than on the customer, who would have to pay $1,000 per instrument otherwise. This is the first I have heard of such an argument." Notes of Simon Constantine of Meeting with Hanna Fischer, Oct. 4, 1996 [Doc. # 922, Ex. 42]. The Court's record does not include any evidence that Constantine pursued the actual use offer after hearing Fisher's explanation for the $300 per cycler fee for "the first time." Soon after, in December 1996, Hybaid joined the Supplier Authorization Program. An earlier file note reflecting Hybaid's negotiation with Applera states that Constantine told Hanna Fisher that a "[p]rocess fee at $300 a control module OK but not to customers who already have a license. Hanna said there were not many of these." Affidavit of Simon Constantine, attached to Supplemental Brief in Opposition to Plaintiffs' Motions in Limine [Doc. # 924, Ex. B] at MJ8057674. In February 1996, Constantine wrote to Applera that "I believe we should either take out a license under the PCR process patent for all our instruments or for none. On re-reading the Thermal Cycler Supplier Agreement, however, I note that the define Fields in paragraph 1.5 exclude human diagnostics. We have various other technologies within the Group which may be developed in conjunction with Hybaid and for which we may need a wider agreement." *Id.* at Ex. C, MJ8058119.

the total sales royalty.[16] In addition, when Stratagene, another thermal cycler supplier, requested a royalty based on actual use, Applera agreed.[17]

Finally, MJ offers no evidence to support its view that Applera had already decided to sue MJ at the time its October 1996 alternative offer was made and was merely preparing the record for litigation.[18] MJ has included an e-mail from Simon Constantine, dated December 4, 1996, which describes a conversation that day with Bill Sawch, stating "I asked about the timing of suing others (originally May). Confidentially ... he told me that PE was waiting for a further patent to be granted in the U.S. which will make their case unequivocal." E-mail of Simon Constantine, Dec. 4, 1996 [Doc. # 427, Ex. G]. This e-mail, dated two months after Applera offered MJ an alternative to the total sales royalty, gives no indication that Applera had decided on litigation at the time the offer was made. Moreover, by MJ's definition, every communication Applera made about its licensing scheme might be deemed "preparing the record" for litigation. As MJ itself notes, Applera had from the beginning implied to suppliers

that it intended to enforce its patent rights by suing those Applera believed were infringing, or inducing infringement, of its patents. The fact that Applera intended to sue MJ for infringement has no bearing on the existence of Applera's alternative licensing proposal. MJ acknowledges that it received Applera's alternative offer and the record reflects the parties' negotiations based on the alternative proposal.

While there is no evidence of formal conditioning, MJ also argues that Applera's alternative proposal to license on an actual use basis does not absolve it of liability for patent misuse, because the alternative proposal was not viable and would coerce MJ into accepting the SAP— a total sales royalty. The parties agree that the mere fact that a licensing program imposes royalties on a total sales basis is not grounds for finding patent misuse where alternatives to the total sales royalty are offered, but they disagree on the standard for evaluating the impact of the alternative licensing plan. Applera has argued that so long as an alternative to a total sales royalty is offered, the inquiry should stop, as no violation may be

---

**16.** For example, the thermal cycler supplier Protean proposed to Applera a discounted per-cycler price on a total sales basis under the existing Supplier Authorization Program, not an alternative to the total sales approach. *See* Letter from GR Rampton, Protean LLC to Hanna Fischer, Aug. 18, 1995 [Doc. # 470, Ex. 50] ("Techne will pay $300 per unit for a license under the process patents for products sold in those territories where Perkin–Elmer owns or is licensed to convey rights equivalent to the U.S. patents identified in the agreement.").

**17.** For example, the thermal cycler supplier Stratagene, which was already participating in Applera's Supplier Authorization Program, wrote to Applera stating, "[s]o that Stratagene will no longer be competitively disadvantaged, Stratagene may consider offering two lines of thermal cyclers, one with a PCR pro-

cess license provided by Stratagene and one with the PCR process license to be obtained by the customer." Letter from Brent Keller to Hanna Fischer, July 8, 1998 [Doc. # 1124, Ex. 37]. In response, Applera agreed to an actual use royalty, stating that "the changes you proposed are not permitted under your current agreement" and that they would need to negotiate a new agreement, which "would be under different financial terms and would require Stratagene to implement a customer compliance program." Letter from Hanna Fischer to Brent Keller, July 31, 1998 [Doc. # 1124, Ex. 38].

**18.** This argument is somewhat perplexing, as it implies that the alternative was, on its face, permissible under the antitrust laws, which is inconsistent with MJ's core argument that the terms of Applera's alternative proposal themselves constituted patent misuse.

found as a matter of law. As Applera points out, in every case identified by the parties in which any alternative to a total sales royalty was offered, no *Zenith Radio* violation has been found. *See, e.g. Plastic Contact Lens Co. v. Young Contact Lens Laboratories, Inc.,* 175 U.S.P.Q. 573, 574 (D.Mass.1972) (rejecting patent misuse claim where an alternative to a total sales royalty was offered, even though the alternative proposed a "substantially higher royalty rate."); *Plastic Lens Co. v. W.R.S. Contact Lens Laboratories, Inc.,* 330 F.Supp. 441, 443 (S.D.N.Y.1970)("The record is devoid of any credible evidence that the plaintiff conditioned the grant of the patent license to the defendants upon payment of royalties on unpatented products. The testimony ... establishes that the plaintiff offered alternative license agreements, one calling for royalties only on lenses covered by the Toy patent and the other (the license agreement herein) calling for royalties at a lower rate but covering all lenses manufactured by the licensees.").

MJ has argued that unlawful conditioning occurs where the alternative offered is not realistic and viable, and where the licensee does not voluntarily accept the total sales arrangement as the more convenient option. MJ relies in part on *Glen,* 420 F.2d at 321, in which the Second Circuit found that "[r]elevant criteria in determining whether there was 'conditioning' would include whether the provision was bargained for or imposed and whether the licensee made 'protestations' which were overridden," and remanded the case to the district court for more factual findings.

Both parties misstate the legal standard. The alternative need not be what MJ deems to be realistic, but it also cannot be a mere "Hobson's choice." Instead, it is necessary to determine whether "the choice is 'genuine' or whether a licensee faced with the disparity of rates would virtually always choose royalties based on total sales and whether such a nonchoice merely reflects the costs of each option." X Areeda, Elhauge & Hovenkamp, *Antitrust Law* ¶ 1782b2 (1996). Thus, the relevant question is not whether MJ found Applera's alternative royalty proposal suitable and accepted it, but whether MJ was offered a genuine alternative within the scope of Applera's patent rights. *See, e.g. Engel Indus., Inc. v. Lockformer Co.,* 96 F.3d 1398, 1409 (Fed.Cir.1996). To be a genuine alternative is to be "both objective[ly] and subjective[ly]" real. *Prof. Real Estate Investors, Inc. v. Columbia Pictures Indus.,* 508 U.S. 49, 61, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993). To prevail on its claim that Applera's licensing scheme unlawfully conditioned the grant of a license on acceptance of a total sales royalty, MJ would have to demonstrate both that the alternative offered objectively was not based on the legitimate costs of administering a license within the scope of Applera's patent rights, and that it was subjectively less than genuine, in that Applera intended for MJ to reject the alternative.[19]

The Second Circuit's decision in *Glen* is distinguishable. In *Glen,* notably, there was no evidence that any alternative to the total sales royalty was offered to the licensee, and as a result, it was necessary to remand the case for more factual findings

---

**19.** Applying this standard, MJ's evidence that suppliers' acceptance of the SAP was slow and that suppliers joined the SAP in the expectation that all other competitors would also join is not material to the total sales royalty issue. Nor is it relevant that the jury's Phase I award of damages for MJ's inducement of infringement was less than the estimated royalty rate under the SAP. The key issue is whether Applera *conditioned* its license grant on a licensee's acceptance of a total sales royalty.

to assess whether there was conditioning or whether the royalty provision was freely negotiated. *See Glen,* 420 F.2d at 321. In contrast, here it is clear that the license grant to use Applera's PCR process patents was not formally conditioned on MJ's acceptance of the total sales royalty; it is undisputed that alternatives were proposed by Applera and rejected by MJ. As recounted above, Applera offered MJ an alternative royalty arrangement from as early as October, 1996, which would have specifically charged a royalty fee only for those thermal cyclers actually used to perform PCR, which MJ rejected because of the verification burden it claims would be imposed on it. From its early negotiations with MJ, Applera's correspondence made clear that it was "willing to consider any proposal" for licensing arrangements instead of its plan to base royalty fees on a percentage of total sales of thermal cyclers. *See* Letter from Hanna Fischer to Michael J. Finney, Feb. 23, 1995 [Doc. # 1124, Ex. 4] at 2–3.

MJ has submitted a declaration by John Finney, President of MJ, which asserts that Applera's proposed alternative was not viable because: (1) "the proposal did not address the transferability issue which MJ has previously raised in its objections to the SAP;" (2) "the customer certification requirement would have forced MJ to pay an authorization fee for any customer that later changed its mind to use its unauthorized thermal cycler to perform PCR in Perkin–Elmer's fields;" (3) "the customer certification requirement would have required MJ to keep track of customer resales of used unauthorized thermal cyclers," which would be "both economically burdensome and commercially impractical;" (4) the "proposal required MJ to discover the names of, and to repeatedly contact, customers for whom MJ had no method of contact;" (5) MJ "believed that it is PE's job to police and enforce its own

patent rights, not the job of its competitors;" (6) "as PE well knew, MJ could not change the software on our de-authorized thermal cyclers so that they could not be used to perform PCR in PE's fields, because if that were done, the thermal cycler also would be functionally incapable of performing any other non-infringing uses, including performing cycle sequencing, LCR or PCR in Roche's retained fields (e.g.diagnostics), all of which require similar or identical programming;" (7) revealing the identity of MJ's thermal cycler customers to Applera, its competitor in the thermal cycler market, was "unthinkable." *See* Declaration of John Finney, Feb. 15, 2004 [Doc. # 920] at ¶ 6.

This evidence cannot meet MJ's burden to show the alternative exceeded the legitimate costs of administration of a license within the scope of Applera's patent, and that as a subjective matter, Applera intended for MJ to reject the alternative. Addressing first the objective prong, there must be evidence that the enforcement burdens imposed on MJ under the actual use proposal were illegitimate, and that the administration of Applera's licensing program could be accomplished through less onerous means. Nothing in the voluminous record before the Court addresses this issue. At best, MJ's assertion, contemporaneously communicated to Applera and repeated in its briefing to the Court, that Applera's licensing program could be advanced by MJ's purchase of authorizations for its customers through the End User Authorization Program ("EAP"), can be construed as an argument that Applera needed no enforcement mechanism, or more broadly that any supplier license would be illegitimate. Such arguments are specious. A jury has determined that MJ willfully induced infringement of Applera's process patents. MJ therefore needed a supplier license to continue to engage

in its infringing activity. Before licensing MJ and thereby giving it immunity from infringement, Applera was entitled to ensure in some way that MJ's customers who performed automated PCR in Applera's fields paid for the intellectual property. MJ's remaining evidence demonstrates simply that the enforcement requirements were burdensome. But showing that requirements of Applera's actual use proposal were burdensome is not enough to prove MJ's patent misuse defense, when MJ has offered no basis for finding that the requirements were more than necessary to protect Applera's patent rights. Because there is no evidence that Applera's alternative proposal was objectively less than genuine, it is not necessary to reach MJ's argument's about Applera's subjective intent.[20]

MJ's final claim is that the alternative was itself not legitimately within the scope of Applera's patent rights, and would both result in imposition of a total sales royalty and improperly license more than the use of the thermal cycler machines. The alternative imposed a total sales royalty, MJ argues, because MJ would be liable for the royalty on any sale for which the end user did not submit an annual certification that it did not perform PCR. Because of the risk that MJ would be forced to pay an authorization fee after the thermal cycler sale was complete, MJ states that it would seek to recover the cost of this risk in the purchase price of the cycler. Relatedly, MJ contends that the certification requirement exceeded Applera's patent rights because MJ would not be inducing infringement if a customer sometime *after* purchase decided to use the thermal cycler to perform PCR.

While the certification requirement imposed an administrative duty on MJ to ensure that those customers not needing PCR process rights returned an annual certification, it did not purport to impose license fees on unpatented activity, and left MJ with the freedom to determine its own thermal cycler pricing. Inducement, moreover, is a highly fact-specific determination, one which would have to take into account MJ's actual motivation at the time of purchase, and its subsequent intentions, for example, in providing technical assistance to its customers.[21] Applera, in the

---

**20.** In contrast to John Finney's detailed declaration, prepared on February 15, 2004 for the third round of briefing on this subject, the record of MJ's contemporaneous communications with Applera reveal only a generalized *concern that MJ did not want to police its* customers. *See* Letter of Michael Finney to Hanna Fischer, Dec. 12, 1996 [Doc. # 1124, Ex. 10] ("Certainly the onerous enforcement requirements of the offer you have sent us are not worth a 10% discount on the price already available to us for the licenses."); Letter of Michael Finney to Michael W. Hunkapiller, Sept. 30, 1997 [Doc. # 1124, Ex. 13]. Because MJ did not contemporaneously inform Applera about the basis for its concerns about the burdens imposed by Applera's actual use proposal, an examination of Applera's subjective intent would require asking whether Applera *designed the requirements to en-sure* MJ's rejection of the alternative. The evidence MJ has presented in this regard is limited. There is evidence that Applera strongly preferred the SAP over other approaches. John Finney, moreover, states in his declaration his conclusion that Applera "well knew" that one condition of Applera's *alternative proposal—disabling the PCR soft-ware* in thermal cycler machines—would be problematic. There are no facts in the record establishing how Applera would have such knowledge. Applera subsequently amended its proposal to remove the requirement that MJ disable its software for PCR use.

**21.** A core factual dispute in Phase I of this case was whether MJ's disclaimers informing its customers about the need for a license from Applera were sufficient to establish that they lacked the intent required for liability for inducing infringement under 35 U.S.C. § 271(b). *See, e.g.* Cote Decl. [Doc. # 787] Ex. 61 at PE 079513 (MJ Research Notebook Autumn 1994) ("... PCR is a process covered

proper exercise of its patent rights, is entitled to take reasonable measures to prevent inducement of infringement, and to ensure that purchasers of MJ thermal cyclers who use the machines for PCR in its fields pay a royalty fee, and that only those who genuinely do not need the license do not pay. In this context, Applera's enforcement requirements do not transform the actual-use licensing proposal into a total sales royalty or otherwise exceed the scope of its patent rights. As the Supreme Court has instructed, "If the risks of infringement are real and [the licensee] would avoid them, he must anticipate some minimum charge for the license—enough to insure the patentee against loss in negotiating and administering his monopoly, even if in fact the patent is not used at all." *Zenith Radio*, 395 U.S. at 140, 89 S.Ct. 1562. The end user in MJ's scenario would undisputedly need a license, and MJ, as a facilitator for the provision of this license, would be capable of passing the cost of the license on to the customer. Moreover, a licensing proposal which placed on the supplier certain administrative burdens, to ensure that end users were not infringing the patent, would simultaneously serve to immunize a supplier from inducement liability.

Applera's alternative proposal also does not improperly license the thermal cyclers as staple goods. Like the SAP, the licenses under Applera's alternative proposal would run with the machines, not with the end users or with the laboratory sites in which they would be used to perform PCR. MJ faults this system because an end user who wished to purchase a new thermal cycler machine [22] would be required to purchase new process patent rights from Applera, even though that user's performance of PCR on a thermal cycler machine was already licensed. This argument must fail as a matter of law. For the reasons discussed in this Court's Ruling on Plaintiff's Motion in Limine to Exclude MJ's Evidence and Arguments Claiming PCR Rights are Tied to Authorized Thermal Cyclers [Doc. # 874], the Supplier Authorization Program does not unlawfully tie PCR process rights to thermal cyclers. In the absence of this tie, the prospect of paying more than once for the right to use a thermal cycler to perform PCR amounts to no more than an increased royalty fee, which is within the scope of Applera's lawful patent monopoly. *See Brulotte*, 379 U.S. at 33, 85 S.Ct. 176; *Monsanto Co. v. McFarling*, 302 F.3d 1291, 1299 (Fed.Cir.

by patents owned by Hoffmann–LaRoche, Inc. Users should obtain license to perform the reaction."); Stern Decl. Ex. 25 at 1 (Circle Reader Service Card No. 93) ("One type of DNA Amplification—the polymerase chain reaction (PCR)—is a process covered by U.S. Patent 4,683,195. A license to perform PCR in any thermal cycling equipment is available from either Roche Molecular Systems of Branchburg NJ, or Perkin Elmer of Norwalk CT."). *But see* MJ Memorandum dated June 1998 [Doc. # 670, Ex. 10] at MJ 7002391 ("In spite of everything we are dealing with regarding PE and the stickers, the truth is most people don't bother to pay PE and get the sticker [i.e. end user license]."); E-mail from Michael Mortillaro to John Hanson, Jun. 24, 1997 [Doc. # 402, Ex. 47] at MJED 0073261 ("We are not price competitive with the ATCs,

and by promoting the ATCs we are telling the customer that 'authorization' is important. I have lost sales to researchers who deem it important that they need authorized cyclers. The more we feed into the paranoia of cycler 'authorization,' the fewer instruments we will sell."). The jury returned a verdict that MJ and Michael and John Finney willfully induced infringement of Applera's process patents.

22. The parties agree that royalties would be paid on replacement machines and loaners. Applera, notes, however, that it expressed flexibility about waiving a second authorization fee where a thermal cycler quickly failed and needed to be replaced. *See* Fischer Letter, Feb. 23, 1995 [Doc. # 1124, Ex. 4].

2002). While Applera certainly might have offered a different licensing program using the "medallion" approach MJ suggests, which would more easily allow the transfer of authorization rights among thermal cyclers, it was not required to do so. Under the licensing scheme developed, authorization rights would run with the thermal cycler upon resale in the secondary market.

Because the alternative licensing program that Applera offered, which based royalties on the actual use of its patents, was within the scope of Applera's patent, and MJ has failed to present any evidence that the alternative exceeded the legitimate costs of administering the license, MJ's argument that unlawful conditioning occurred must fail as a matter of law.

## IV. Conclusion

For the foregoing reasons, MJ's Motion for Summary Judgment Determining that Plaintiffs' Licensing Scheme Imposes a Total Sales Royalty [Doc. # 1123] is DENIED and Plaintiffs' Cross Motion for Summary Judgment Seeking a Determination that Applera's Licensing Program does not Impose an Improper Total Sales Royalty and Thus is Not Patent Misuse [Doc. # 1153] is GRANTED. In light of this decision, Plaintiff's Motion in Limine to Exclude Evidence and Argument that a Supplier's Payment for the PCR Process Patents on a Total Sales Basis is Illegal, Patent Misuse or Anticompetitive [Doc. # 667(3) ] is GRANTED.

IT IS SO ORDERED.